IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| | * | 4:19-CR-00149 |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| JAMES AARON JACOBS, | * | ORDER GRANTING |
| | * | COMPASSIONATE RELEASE |
| Defendant. | * | |
| | * | |

Before the Court is Defendant James Aaron Jacobs's Motion for Compassionate Release,
filed on June 9, 2020.  ECF No. 76.  The Government filed its Resistance on June 19.  ECF
No. 81.  Defendant replied on June 26.  ECF No. 82.  The matter is fully submitted.

I.  BACKGROUND

On September 11, 2019, the Government charged Defendant in a one-count indictment
with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  ECF No. 24.
In short, police had obtained a warrant to search his home, in which they found a handgun and
methamphetamine packaging materials.  ECF No. 67 ¶ 9.

Defendant, now forty-two years old, has a long and diverse record of convictions going
back to age nineteen.  *Id.* ¶¶ 27–44.  These convictions include underage drinking, domestic
violence, theft, and drug possession.  *Id.*  ¶¶ 27–44.  He also has been diagnosed with bipolar
disorder, depression, anxiety, and post-traumatic stress disorder.  *Id.* ¶¶ 72.

These histories appear at least somewhat intertwined.  Defendant pleaded guilty to
involuntary manslaughter in 2000 following a drunk-driving accident.  *Id.* ¶ 30.  The accident
killed Defendant's best friend.  *See id.* ¶ 74; ECF No. 79 at 13:1–5.  Defendant states he has "not

been able to get past it for [twenty] years" and did not attempt therapy to address the matter until 2019.  ECF No. 79 at 7:13, 13:1–5.

Also since age nineteen, Defendant has consumed alcohol daily but for periods of incarceration.  ECF No. 67 ¶ 75.  At age fifteen, the defendant first used methamphetamine.  This progressed to using each weekend, which then progressed to using daily.  *Id.* ¶ 76.  He once had a cocaine habit, too.  *Id.* ¶ 77.  Although Defendant may be new to mental-health therapy, he has repeatedly attempted, and failed at, substance-abuse treatment.  *Id.* ¶¶ 81–83.  Defendant meanwhile has held various jobs as an electrician, work he believes he could obtain again should he be released.  *Id.* ¶¶ 91–94.

Defendant pleaded guilty on January 15, 2020.  ECF No. 57.  In between Defendant's guilty plea and May sentencing, a global pandemic began.  With the Southern District of Iowa then all-but closed to in-person hearings, Defendant consented to sentencing via Zoom, a now-omnipresent video conferencing program.  ECF No. 71.  The Court sentenced Defendant to twenty-four months imprisonment, ECF No. 73, a clock that started running August 16, 2019, *see* ECF No. 67 ¶ 90.  Considering time credits, the Federal Bureau of Prisons (BOP) predicts his sentence will be fulfilled on April 28, 2021.  *Find an Inmate*, Fed. Bureau Prisons, https://www.bop.gov/inmateloc/ (last visited June 30, 2020).

At sentencing, Defendant's counsel stated he felt very ill.  ECF No. 70 at 9:21–22 ("Today he indicated he's never felt this bad in his life.").  The Court stated that if Defendant had such complaints, "they ought to be treated" by the Polk County Jail.  ECF No. 79 at 16:1.

This did not occur.  Defendant tested positive for COVID-19 a week later following repeated requests.  ECF No. 76 at 1.  Beyond that, Defendant's treatment has consisted of Tylenol and sequestration in a part of the jail reserved for infected inmates.  *Id.* at 16; ECF

No. 82 at 4.  Defendant has been symptomatic for more than a month.  ECF No. 82 at 4.  He continues to report various aches that keep him up at night.  *Id.*  When he mentioned these symptoms to a nurse, he was given antibiotics, which did not help.  *Id.*  He continues to test positive for the virus.  *Id.*

COVID-19 has killed more than 126,000 Americans and infected more than 2.6 million in a few months.  *Mortality Analysis*, Johns Hopkins U. & Med. (June 30, 2020, 5:41 AM), https://coronavirus.jhu.edu/data/mortality.  "At this time, there is no known cure, no effective treatment, and no vaccine.  Because people may be infected but asymptomatic, they may unwittingly infect others."  *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring).

We limited access to courts, schools, churches, theaters, and "non-essential" businesses— places where there are too many people and too little space to keep the virus from spreading.  That also sounds a lot like jail and prison.  Already "tinderboxes for infectious disease," jails and prisons now are even more dangerous than we typically accept.  *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020).

The situation is particularly dire at county jails, some of which hold federal prisoners who have been sentenced but not yet transferred to a federal prison.  Jails—where prisoners come and go with more frequency than in prisons—are responsible for some of the worst COVID-19 outbreaks in America.  *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (June 30, 8:00 AM), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.  By one count, American jails and prisons account for the deaths of 657 inmates and correctional workers.  *Id.*

Defendant's facility, Polk County Jail, is no exception.  *See id.* (showing 128 cases linked to Polk County Jail); *see also* Philip Joens & Tyler J. Davis, *89 inmates, 9 staff members at Polk County Jail have tested positive for COVID-19*, Des Moines Register (May 22, 2020, 4:41 PM), https://www.desmoinesregister.com/story/news/2020/05/22/covid-19-iowa-coronavirus-at-polk-county-jail-89-inmates-nine-staff-test-positve/5242940002/.  As of June 30, positive cases had declined to nineteen inmates and two employees.  *COVID-19 Quick Stats*, Polk County Sheriff (June 30, 2020), https://www.polkcountyiowa.gov/county-sheriff/news-press-releases/covid-19-quick-stats/.

These numbers are particularly concerning because federal prisoners are now being forced to remain within local jails seemingly indefinitely after sentencing.  The BOP has delayed its intake of recently sentenced defendants from local facilities to combat the pandemic.  *See* ECF No. 81 at 6; *BOP Implementing Modified Operations*, Fed. Bureau Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 30, 2020).

The BOP, county jails, and state prisons indeed face a daunting task.  The Government represents the Polk County Jail has taken numerous mitigation measures, including screening for known symptoms, temperature checks, extra cleanings, and quarantining of infected and vulnerable inmates.  ECF No. 81 at 6–7.

Defendant disputes the extent to which the Polk County Jail follows these procedures. ECF No. 82 at 1–3.  It also is unclear to what extent this list reflects the Jail's current policies. For instance, the Government represents that *zero* inmates have tested positive.  ECF No. 82 at 6. That simply is not so, and the Government knows it.  The Federal Public Defender (FPD) also represents that inmates have been using the same, unwashed, cloth masks for months.  *Id.* at 5.

## II.  ANALYSIS

The First Step Act of 2018 amended numerous provisions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration.  Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1 (2019).  Congress designed the statute at issue here, § 3582(c)(1)(A), for "Increasing the Use and Transparency of Compassionate Release."  § 603(b), 132 Stat. at 5239.  This provision allows defendants, for the first time, to petition district courts directly for compassionate release.  *Id.*  Under the old regime, defendants could petition only the BOP Director, who could then make a motion, at his or her discretion, to the district court.  *See* U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n.4 (U.S. Sentencing Comm'n 2018) [hereinafter U.S.S.G.].  The Director rarely did so.  *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).

### A.  *Exhaustion*

The First Step Act's gate-keeping provision created two ways for a defendant to bring a compassionate release motion to a district court.  The defendant may file a motion after he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  § 3582(c)(1)(A).

Here, the Government acknowledges the Defendant need not satisfy the statute's gatekeeping function because it would be impossible to do so.  ECF No. 81 at 3 (collecting cases).  Defendant is not in a BOP facility, and thus, cannot petition the BOP for his release.  *See id.*  And because § 3582(c)(1)(A)'s gatekeeping requirement is a non-jurisdictional claim-processing rule, the Government can waive its requirements.  *United States v. Alam*, 960 F.3d

831, 834 (6th Cir. 2020).  The Government has made such a waiver, and the Court will address the merits.

### B. *Extraordinary and Compelling Reasons*

Compassionate release provides a path for defendants with "extraordinary and compelling reasons" to leave prison early.  § 3582(c)(1)(A)(i).  Such a sentence reduction must comply with the 18 U.S.C. § 3553(a) factors and "applicable policy statements issued by the Sentencing Commission."  § 3582(c)(1)(A).

### 1. Definitions

Congress never defined what constitutes "extraordinary and compelling."  *See* 28 U.S.C. § 994(t).  Instead, Congress directed the Sentencing Commission to promulgate "the criteria to be applied and a list of specific" extraordinary and compelling examples.  *Id.*  Before the First Step Act, the Commission provided just three: terminal illness, an elderly inmate's rapidly declining health, and care for dependent family members.  U.S.S.G. § 1B1.13 cmt. n.1.

The Commission also provided a catch-all provision that allows the BOP Director to determine "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the" examples described above.  *Id.* § 1B1.13 cmt. n.1(D).  That still begs the question: what is extraordinary and compelling?

Congress and the Commission gave two general guideposts.  Extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing."  *Id.* § 1B1.13 cmt. n.2.  For example, just because a judge believes a defendant will dramatically improve himself while incarcerated, that does not mean she cannot deem such improvement extraordinary and compelling.  And although "[r]ehabilitation of the defendant *alone* shall not be considered an

extraordinary and compelling reason," its mention by Congress indicates rehabilitation may be considered with other factors.  § 994(t) (emphasis added); *see also* U.S.S.G. § 1B1.13 cmt. n.3.

Courts otherwise are left to themselves because the Commission never updated its policy statement for the First Step Act.[1]  Rather, the outdated policy statement still assumes compassionate release "may be granted only upon motion by the Director of the Bureau of Prisons."  U.S.S.G. § 1B1.13 cmt. n.4.  This left district courts in a conundrum.  On the one hand, Congress unequivocally said it wished to "[i]ncreas[e] the [u]se . . . of [c]ompassionate [r]elease" by allowing district courts to grant petitions "consistent with *applicable* policy statements" from the Commission.  § 3582(c)(1)(A) (emphasis added).  On the other hand, the Commission has not made the policy statement for the old regime applicable to the new one.

Many courts, including this one, have concluded this means the Commission lacks an applicable policy statement regarding when a court can grant compassionate release.  *United States v. Brown*, No. 4:05-CR-00227-1, 2020 WL 2091802, at *6 (S.D. Iowa Apr. 29, 2020), *appeal dismissed following government request*, No. 20-2053 (8th Cir. June 16, 2020); *United States v. Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *14 (E.D.N.Y. Apr. 22, 2020) (citing thirteen such cases).  In the absence of an applicable policy statement, these courts conclude "the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant granting relief."  *Cantu*, 2019 WL 2498923, at *5; *see also United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) (treating "the previous BOP discretion to identify other extraordinary

---

[1] The Commission cannot amend its guidelines until it again has four voting commissioners. *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *1 n.1 (S.D. Tex. June 17, 2019) (quoting *United States v. Handerhan*, No. 1:10-CR-00298, 2019 WL 1437903, at *1 n.4 (M.D. Pa. Apr. 1, 2019)).  The Commission still has only two voting members. *About the Commissioners*, U.S. Sentencing Comm'n, https://www.ussc.gov/commissioners (last visited June 30, 2020).

and compelling reasons as assigned now to the courts"). The result is that the district court can consider anything—or at least anything the BOP could have considered—when assessing a defendant's motion. This now "appears to be the majority position." *United States v. Scott*, No. 17-CR-156, 2020 WL 2508894, at *8 (E.D. Wis. May 15, 2020).

To be sure, some courts and the Government still maintain that the First Step Act merely allows courts to grant a motion for compassionate release if the BOP Director would have done the same under the Sentencing Guidelines and the BOP Program Statement written for the old law. These courts conclude they may not stray beyond the specific instances listed in § 1B1.13's commentary. *E.g.*, *United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019). They reason that the Sentencing Commission reserved that commentary's residual provision for the BOP Director and only the BOP director. *Id.*

The Court remains unpersuaded. The U.S. Supreme Court repeatedly has noted that "'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947)). Although titles are not dispositive, sometimes they can be "especially valuable." *Yates v. United States*, 574 U.S. 528, 552 (2015) (Alito, J., concurring).

Such is the case here. The Act listed these changes under the title of "Increasing the Use and Transparency of Compassionate Release." § 603(b), 132 Stat. at 5239. Congress knew of the BOP's rare granting of compassionate release petitions.[2] Until 2013, on average, "only [twenty-four] inmates were released each year." *Hearing on Compassionate Release and the*

---

[2] The First Step Act's compassionate release provisions originally appeared as a stand-alone bill. Granting Release and Compassion Effectively Act of 2018, S. 2471, 115th Cong. (2018). That bill explicitly sought to "improve the compassionate release process of the Bureau of Prisons." *Id.*

*Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E.
Horowitz, Inspector General, Dep't of Justice).  That number increased to eighty-three inmates
between August 2013 and September 2014 following complaints to the BOP from the Inspector
General's office.  *Id.*  Since Congress still amended the program following this increase, one can
infer Congress thought eighty-three was still insufficient.  Because rather than "effectively
ratif[ying]" the BOP's position, Congress sought to overturn it by statute.  *Food & Drug Admin.
v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000).  Therefore, the only way
inmate motions to courts would increase the use of compassionate release is to allow those courts
to consider the vast variety of reasons that may be "extraordinary and compelling."

Yes, releasing defendants from incarceration is a delicate business—but not any more so
than incarcerating them initially.  Indeed, Congress and the Supreme Court have long trusted
district courts to "consider every convicted person as an individual and every case as a unique
study in the human failings that sometimes mitigate, sometimes magnify, the crime and the
punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996).  In sum, if the First Step
Act is to increase the use of compassionate release, the most natural reading of § 3582(c) is that
the district court assumes the same discretion as the BOP Director when it considers a
compassionate release motion properly before it.

2.  Defendant's Extraordinary and Compelling Reasons

Without a clearly prescribed definition, Defendant argues the Court should turn to
persuasive authorities from courts and commentators as to what constitutes extraordinary and
compelling.  For instance, Defendant notes that Black's Law Dictionary defines "extraordinary"
as "[b]eyond what is usual, customary, regular, or common."  *Extraordinary*, Black's Law
Dictionary (11th ed. 2019).  The oft-cited book meanwhile defines "compelling need" as "[a]

need so great that irreparable harm or injustice would result if it is not met." *Compelling Need*,

Black's Law Dictionary (11th ed. 2019).  Although the Court does not believe these words

constitute the beginning and end of the analysis, they are worth noting.

The number of courts agreeing the mere threat of COVID-19 constitutes an extraordinary

and compelling reason supporting release still grows by the day.  *E.g.*, *United States v. Williams*,

No. 06-CR-0143 (WMW/FLN), 2020 WL 3097615, at *2 (D. Minn. June 11, 2020); *United*

*States v. Nazzal*, No. 10-20392, 2020 WL 3077948, at *4 (E.D. Mich. June 10, 2020); *United*

*States v. Mason*, No. 317CR104CWRLRA3, 2020 WL 3065303, at *2 (S.D. Miss. June 9, 2020);

*United States v. Conner*, No. CR07-4095-LTS, 2020 WL 3053368, at *7 (N.D. Iowa June 8,

2020); *United States v. Moore*, No. 3:16-CR-00171-JO, 2020 WL 2572529 (D. Ore. May 21,

2020); *United States v. Galloway*, No. RDB-10-0775, 2020 WL 2571172 (E.D. Mich. May 21,

2020); *United States v. Parker*, No. 2:98-cr-00749, 2020 WL 2572525 (C.D. Cal. May 21, 2020*)*;

*United States v. Schneider*, No. 14-CR-30036, 2020 WL 2556354, at *1 (C.D. Ill. May 20,

2020); *United States v. Hill*, No. 3:19-cr-00038 (JAM), 2020 WL 2542725 (D. Conn. May 19,

2020); *United States v. Bright*, No. 2:15CR00015-005, 2020 WL 2537508 (W.D. Va. May 19,

2020); *United States v. Bischoff*, No. 17-cr-196-JD, 2020 WL 2561423 (D.N.H. May 18, 2020);

*United States v. Cotinola*, No. 13-CR-03890-MV, 2020 WL 2526717, at *3 (D.N.M. May 18,

2020); *United States v. Rountree*, No. 1:12-CR-0308 (LEK), 2020 WL 2610923 (N.D.N.Y. May

18, 2020); *United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at *9 (W.D.N.Y. Apr. 22,

2020); *United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL 1849748, at *4 (S.D.N.Y. Apr.

13, 2020); *United States v. Hernandez*, No. 18 CR. 834-04 (PAE), 2020 WL 1684062, at *3

(S.D.N.Y. Apr. 2, 2020); *Rodriguez*, 2020 WL 1627331, at *1; *United States v. Jepsen*, No. 3:19-

CV-00073(VLB), 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020); *United States v. Campagna*,

No. 16 CR. 78-01 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020).

Other Courts have found that a defendant can present a sufficiently extraordinary and

compelling reason for release if he or she receives inadequate care following a COVID-19

diagnosis or has underlying health conditions that can make that diagnosis more deadly.[3]  *United*

*States v. Arreola-Bretado*, No. 3:19-CR-03410-BTM, 2020 WL 2535049, at *3 (S.D. Cal. May

15, 2020) ("Notwithstanding actions to try to deal with the large number of COVID-19 cases at

Otay Mesa, the conditions there are not sufficient to care for Ms. Arreola-Bretado."); *United*

*States v. Fischman*, No. 16-CR-00246-HSG-1, 2020 WL 2097615, at *2 (N.D. Cal. May 1,

2020).  In other words, a COVID-19 diagnosis does not moot a defendant's request for

compassionate release.[4]

Here, Defendant presents the extraordinary scenario in which he has contracted COVID-

19, a virus for which "there is no known cure, no effective treatment, and no vaccine."  *S. Bay*

*United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).  The virus is

"devastating to those unfortunate enough to contract it.  It attacks the nose, throat, and lungs of

its victims, resulting in effects ranging from flu-like symptoms, to pneumonia, to acute

respiratory disease, to death."  *Wilson v. Williams*, No. 20-3447, slip op. at 21 (6th Cir. June 9,

2020) (Cole, C.J., concurring in part and dissenting in part).  Defendant, meanwhile has spent the

---

[3] Some courts have found that a COVID-19 diagnosis can bring a defendant within the ambit of
the Sentencing Commission's outdated policy statement. *United States v. Davis*, No. 2:15-CR-00062-
TLN, 2020 WL 3443400, at *2 (E.D. Cal. June 23, 2020) (holding defendant "met his burden to
demonstrate he is subject to a serious or unrecoverable condition that substantially diminishes his ability
to provide self-care"); *United States v. Barber*, No. 6:18-CR-00446-AA, 2020 WL 2404679, at *5 (D. Or.
May 12, 2020).  Defendant does not make that argument here, and the Court need not address it.
[4] Some medical experts recently warned it "could be risky to assume that recovered patients are
immune to reinfection."  Robert Roos, *Chinese Study: Antibodies in COVID-19 Patients Fade Quickly*, U.
Minn., Ctr. for Infectious Disease Res. & Pol. (June 19, 2020), https://www.cidrap.umn.edu/news-
perspective/2020/06/chinese-study-antibodies-covid-19-patients-fade-quickly.

past six weeks suffering from symptoms while receiving almost zero medical care.  That makes Defendant's ten months incarcerated far "harder" time than is typical.

Incarceration always carries risks of dangerous pathogens.  Even so, COVID-19 cannot be just another collateral consequence of incarceration.  *Cf. id.* at 14 (majority opinion) (holding that prison's COVID-19 protocol was within constitutional bounds but indicating at least some protocol is required).  The fact Defendant has suffered and appears to have been given nothing more than Tylenol, ineffective antibiotics, and a now-dirty mask as he battles this virus is compelling, at the very least.

The case for release becomes more compelling, still, for a defendant with very little time left in his sentence.  *United States v. Perez*, No. 17 CR. 513-3 (AT), 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020).  This is so because "[t]he benefits of keeping him in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave."  *Id.*  As in *United States v. Anderson* from a neighboring district, the fact "Defendant has approximately one year remaining on his sentence" further supports release. No. 15-CR-30015, 2020 WL 2521513, at *5 (C.D. Ill. May 18, 2020).

Thus, Defendant presents an "extraordinary" reason because he is suffering from a highly contagious virus the likes of which America's jails and prisons have not faced, at least in our lifetimes.  The Court also finds this reason is "compelling" because it would indeed constitute an irreparable harm and injustice if Defendant suffers even worse side effects from his COVID-19 infection during such a short sentence.

### C.  *§ 3553(a) Factors*

The Court also must consider if compassionate release comports with any applicable § 3553(a) factors.  § 3582(c)(1)(A).  The Court's lodestar is to ensure the sentence is "sufficient,

but not greater than necessary." § 3553(a).  The Court also conducts this analysis given the conditions Defendant has faced in Polk County Jail, not the conditions a Defendant usually experiences in a BOP facility.

In Defendant's case, possessing a weapon as a felon is a status offense, but it is a dangerous one.  *See* § 3553(a)(1).  Defendant, meanwhile has a series of convictions, including several domestic violence cases.  He has a history of drug addiction and involvement in a white-supremacist prison gang.  ECF No. 67 ¶¶ 55, 75–85.  In other words, Defendant deservedly has no right to own a gun.  Even so, Defendant has no violent convictions that involve discharging a firearm.  *See Id.* ¶¶ 27–44.  Rather, Defendant appears to hold the stubborn belief of many in this District that one who traffics in methamphetamine must own a gun, even if it is only used to increase one's prison sentence.  *See* ECF No. 55 at 1.

Still, the Court must assess Defendant as a whole person.  *Koon*, 518 U.S. at 113. Defendant appears to genuinely recognize the various ways in which he has misspent his twenties and thirties.  *See* ECF No. 79 at 13:15–16 ("[W]hen I read my [presentence investigation report], I was devastated that I had been lying to myself about the person that I have become.").  And while he has long had diagnoses for mental health conditions, it appears he only began to try to attempt psychiatric therapy last year.  *Id.* at 7:12–13; 13:6–7; ECF No. 67 ¶¶ 72–73.  The Court does not excuse Defendant's behavior during the past two decades.  The Court is "simply suggesting that [he is a] human being[]," with flaws, virtues, and a need for empathy.  Richard S. Arnold, Remarks Before the Judicial Conference of the Eighth Circuit: The Art of Judging (Aug. 8, 2002).

The "need for the sentence imposed" also appears weaker given the hellish month Defendant has lived since sentencing.  § 3553(a)(2).  Although in normal times another year

incarcerated might be appropriate, normal times these are not.  The Government argues the Court

already accounted for the risks of COVID-19 when it sentenced Defendant in May.  That

certainly is true.  However, the Court had trusted Defendant would receive medical attention

beyond Tylenol if he presented a symptomatic case of COVID-19.

The Court acknowledges the need "to protect the public from further crimes of the

defendant."  § 3553(a)(2)(C).  However, given Defendant's weakened condition and the fact

incarceration is not the only "kind[] of sentence available," there are other ways to achieve the

same public protection.  § 3553(a)(3).  Congress designed supervised release for people like

Defendant, a "problem case among problem cases." *Johnson v. United States*, 529 U.S. 694, 709

(2000).  Indeed, "if any prisoner might profit from the decompression stage of supervised

release, no prisoner needs it more than one who has already tried liberty and failed." *Id.*

Defendant now presents a compelling alternative to prison in a term of supervised release

with a home-confinement condition at his mother's home in Winterset, Iowa.  ECF No. 82 at 5.

A U.S. Probation Officer, at the Court's request, has confirmed Defendant's mother remains

supportive of Defendant, has prepared a separate bedroom for him, and is aware of the serious

precautions she needs to take to prevent further spread of COVID-19.

Noncustodial sentences also curtail "prized liberty interests" and "the Defendant always

*faces the harsh consequences that await if he violates the conditions*" attached to such a

sentence. *United States v. Gall*, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005) (emphasis added),

*rev'd*, 446 F.3d 884 (8th Cir. 2006), *rev'd*, 552 U.S. 38 (2007).  Such restrictions also promote

respect for the law, protect the public, and do not constitute any endorsement of Defendant's

conduct.  *See id.*

Meanwhile, Defendant's experience as an electrician indicates that a year in federal prison—or Polk County Jail—will not provide him with "needed educational or vocational training." § 3553(a)(2)(D). Although Defendant certainly needs more mental-health and substance-abuse treatment, he has been participating in such programs through jails and prisons for decades to no apparent benefit. ECF No. 67 ¶¶ 81–83. There is little reason to think nine more months of access to such courses will somehow lead to a different result.

The Sentencing Commission's Guidelines counseled in a sentence of thirty to thirty-seven months. ECF No. 79 at 6:15. The Court varied downward slightly at sentencing with a custodial sentence of twenty-four months. Although compassionate release would represent a further downward variance, it would be a minor one. This especially is so compared to many of the compassionate release motions granted by this Court and others during the current pandemic. The Court would have been well within its discretion to sentence Defendant to supervised release with a condition of home confinement. Had it known Defendant would soon test positive for COVID-19 and then receive such minimal care, it would have done so.

A court's decision does not cease to be an "exercise of reason simply because it is also an exercise of compassion." *United States v. Likens*, 464 F.3d 823, 827 (8th Cir. 2006) (Bright, J., dissenting), *cited with approval in Gall*, 552 U.S. at 52 n.7. The Court grants Defendant's Motion for compassionate release because it is supported by extraordinary and compelling reasons as well as the § 3553(a) factors.

## D. *Release Plan*

Defendant's remaining term of imprisonment shall be served as a term of supervised release. In addition to the terms of supervised release imposed in the original judgment, Defendant shall be subject to a condition of home confinement at the home of Sue and Russell

Jacobs in Winterset, Iowa. Defendant *must* reside at this, and only this, residence. When that term expires on his current release date,[5] he shall then serve the two-year term of supervised release already imposed.

Upon release, Defendant shall contact the Southern District of Iowa U.S. Probation and Pretrial Services Office (USPO) within forty-eight hours. He shall submit to USPO screening for COVID-19 following his release to the extent it is available. He also shall remain in self-quarantine for fourteen days upon returning home. He shall comply with national, state, and local orders regarding COVID-19.

## III. CONCLUSION

For the reasons stated herein, Defendant's Motion for Compassionate Release (ECF No. 76) is GRANTED.

IT IS SO ORDERED.

Dated this 2nd day of July 2020.

ROBERT W. PRATT, Judge
U.S. DISTRICT COURT

---

[5] Defendant is scheduled to be released April 28, 2021. *Find an Inmate*, Fed. Bureau Prisons, https://www.bop.gov/inmateloc/ (last visited June 30, 2020).